# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| Fedeline Desire, Tiffany Robertson individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff(s),<br><br>v.<br><br>DREAMWEAR INC. et al.,<br>Defendant(s) | Civil Action No.1:21-cv-161178-NLH SAK<br><br>AMENDED COMPLAINT FOR DAMAGES FOR VIOLATION OF NEW JERSEY AND FEDERAL CIVIL RIGHTS ACTS<br><br>JURY TRIAL DEMANDED |

**Kwame L.A. Dougan, Esq.**

**Scotch & Palm Private Client Law Group, LLC**

252 Nassau St.

Princeton, NJ 08540

E-Mail: kwame.dougan@scotchpalm.com

Phone:  (917) 737-9920

**Attorney(s) for Plaintiffs**

# FIRST AMENDED COMPLAINT

## NATURE OF THE ACTION

1. Defendants have further failed to follow COVID-19 safety guidelines that have disproportionately affected women and have placed women of color in dangerous conditions.

2. Plaintiff seeks injunctive and declarative relief, damages, including economic, compensatory, liquidated, and punitive damages.

## SUMMARY OF THE COMPLAINT

This Complaint alleges that Defendants violated Plaintiffs' civil Rights by unlawfully discriminating because of race, nationality, and gender.   Defendants advanced a culture that rewarded sexual harassment, racial animus creating a toxic work environment causing emotional distress and economic harm that is ongoing. Defendants have de facto segregated workplace structure and use systemic gender-based pay discrimination against its female employees, causing, contributing to, and perpetuating race and gender-based pay disparities through common policies, practices, and procedures, including but not limited to discretionary compensation policies, management policies, and centralized decision-making.

## THE PARTIES

Plaintiffs allege that:

3. Plaintiff Fedeline Desire is an African American female previously employed by and constructively terminated Defendants.

4. Plaintiff Tiffany Robertson is an African American female employed by Defendants.

5. Defendant Dreamwear Inc. is a multinational fashion wear enterprise selling products and producing fashionwear for corporate clients including, Amazon, Macys, and Target, and employees working remotely and globally, with headquarters at 183 Madison Ave 10th Fl. New York, New York, 10016.

6. Defendant Joseph Franco is Founder and Principal of DREAMWEAR INC.;

7. Defendant Elliot Franco is Founder and Principal of DREAMWEAR INC.;

## COMPLAINT

8.   "XYZ Corporations" 1-10 (Names Fictitious); and "John and/or Jane Does" (Names Fictitious) were employed by, contracted by, affiliated with Dreamwear (collectively "Defendants").

## I.   FACTUAL ALLEGATIONS  (GENERAL)

9.   Plaintiffs are African-African Black women employed and previously employed by Defendants.

10.  Plaintiffs are black women that suffer the dueling indignities of sexual harassment, racial discrimination, and diminished economic opportunities because Defendants foster a hostile work environment and enforce a de facto racial hierarchy among its staff.

11.  Defendant's staff is as segregated as is possible in cosmopolitan New York City, where black women neatly congregate the lower rungs of Dreamwear's organizational hierarchy regardless, of tenure, experience, or demonstrated ability.

12.  Among its almost 200 employees, the few black women employed possess exceptional qualifications and perform well.

13.  Defendant's leadership disregards credible claims of sexual harassment and racially motivated misconduct.

14.  Defendant's response has been to enact policies and procedures designed to suppress reports of misconduct, harassment and retaliation.

15.  Dreamwear's owners, Elliot and Joseph Franco, have allowed unchecked an environment hostile to black women within Defendants' workplace, causing Plaintiffs emotional distress, violating their civil rights, and causing irreversible economic harm.

16.  Defendants have further designed a system of promotions designed to permanently limit the pay of its female staff.

**COMPLAINT**

17. Over a period of at least two years and continuing to the present, defendants oversaw the creation and maintenance of a segregated and hostile work environment.

18. Among Defendant's personnel, Black employees are on average paid less than non-black employees, including those of similar skill.

19. Among Defendant's personnel, Black employees are promoted less than non-black employees, including those of similar skill.

20. Black applicants are denied leadership roles at a rate disproportionate to non-black applicants to available roles, including to lesser skilled applicants.

21. Black women are denied promotions, wages, or transfers at rates commensurate to their experience and relative to similarly or less qualified people.

22. Defendants have applied its policies in an ad hoc and discretionary fashion to the detriment of plaintiffs.

23. Defendant's policies and procedures are the proximate cause of black employees earning lower wages than non-black staff despite experience and qualifications.

24. Defendant's policies and procedures are arbitrarily applied to the detriment of black women by non-black individuals in positions of power.

25. Defendant's practices reward supervisors, management, directors and human resources personnel that negligently or intentionally fail to investigate allegations by black women subjected to conduct violative of federal and state constitutional civil rights.

26. Defendants foster and tolerate a culture that permits racially offensive jokes.

27. Defendants have failed to diligently investigate allegations of sexual harassment, resulting in an under-reporting of harassment.

28. The Designer role is a coveted leadership position within Defendant's company.

29. Numerous qualified Black women have applied for designer roles in Defendant's New York Office.

**COMPLAINT**

30. On Information and Belief, Defendant has not hired or promoted one black Designer on any Team in the company.

31. Defendants routinely hire and promote non-black and male individuals less qualified than Plaintiffs.

32. Plaintiffs complained about the defendants' activities internally because they violated Public Policy of this State.

33. Plaintiffs suffered adverse actions for making such complaints.

34. Upon information and belief, of almost 200 women, a disproportionate number of black women remain down among the lowest rungs of the company's organizational ladder, and are regularly subject to racially suggestive pejorative comments from men and women in supervisory positions or by management.

## II.    BLACK WOMEN EMPLOYEES ARE PAID LESS, PROMOTED RARELY, AND SUBJECTED TO HARSHER STANDARDS

35.  Plaintiff Desire reported sexual harassment to Defendants.

36. Plaintiff Desire reported racial discrimination to Defendants.

37. Plaintiff Robertson reported sexual harassment to Defendants.

38. Plaintiff Desire reported racial discrimination to Defendants.

39. Plaintiffs suffered and reported harassment to Defendants on multiple occasions, including:

40. By Director R.T. who targeted Plaintiffs, complaining about the tenor and abrasiveness of Plaintiffs' voices.

41.  By employee LSK, who repeatedly physically encroached on Plaintiff Desire's desk, and yelled at, berated, and otherwise spoke harshly to and about Plaintiffs, witnessed by Defendant's leadership, who took no action.

42. Plaintiffs were subjected to racial slurs and pejoratives, and tasked with carrying the pain

**COMPLAINT**

of witnessing, hearing, or being subjected to racial slurs in the office by Defendants, including:

43. By Michael L. yelling at Black woman that she resembled "Aunt Jemima" before an audience at a company function;

44. By Howard (Doe) using racial slurs;

45. By leadership's guests who bemoaned the inability to insult via "mak[ing] black jokes" ;

46. Plaintiffs reported the use of derogatory language by leadership.

47. Defendants took no action against or in response to the allegations.

48. Plaintiffs faced subtle and overt forms of retaliation for repeatedly escalating reporting sexual harassment and racial discrimination.

49. Plaintiffs were scheduled and seated in a way to avoid them comparing notes about the discrimination treatment each saw and felt.

50. Defendants retaliated and discriminatory conduct by denying elevation to roles with more pay, prestige and opportunities.

51. Defendants have denied Plaintiff's opportunities for which they were qualified.

52. Defendant filled those roles with less qualified men and non-black staff.

53. As recently as winter 2020, a putative plaintiff, Jane Doe 3, with glowing positive performance reviews, applied for a position to join a team she had sought since joining the company.

54. She was promised strong consideration for the role upon availability.

55. The opportunity arrived and Defendants summarily dismissed Jane Doe 3's application despite having bolstered her qualifications since joining the company.

56. Defendants continued to seek applications, giving strong consideration to less-qualified persons.

57. Only after Plaintiff's counsel sent a notice to Defendant(s) that it was investigating its

**COMPLAINT**

conduct, Defendants belatedly offered Robertson a pseudo-promotion similar to a role she had been denied only months early.

58. On information and belief, after Plaintiff's counsel sent a notice to Defendant(s) that it was investigating its conduct did Defendants terminate a Director that supervised and permitted the discriminatory conduct described.

59. Defendant's egregious conduct compelled Plaintiff Desire to escape the hostile treatment by separating from the Company.

60. After expressing her intent to separate, Defendant sent disparaging comments in written form to staff and external actors.

## FACTUAL ALLEGATIONS (SPECIFIC)

_Defendants do not properly train or supervise management and staff about sexual harassment, racial discrimination, or have a formal process to investigate allegations of same._

61. Plaintiffs reported unlawful conduct up the ladder to HR and Directors in Dreamwear.

62. Defendants have failed to investigate Plaintiffs' complaints.

63. Defendants refused to investigate Plaintiffs' complaints.

64. Defendants refused to act in response to allegations of harassment, finding no evidence of harassment because the reported conduct was not "criminal" in nature.

65. Plaintiffs have received different treatment than their white women counterparts in the following ways:

66. Plaintiffs have been subject to the de facto segregated team of "colorists".

67. Supervisors berate and yell at Plaintiffs during meetings.

68. During meetings, supervisors routinely draw women of color aside, into corners and hallways, accosting them, causing fear and panic among the mostly female staff.

69. During virtual meetings, Plaintiffs are disciplined or criticized for choosing not to show their face on the screen despite expressing discomfort, but white employees are not

## COMPLAINT

required to do the same nor are they criticized.

70. Supervisors ask Plaintiffs to pipe down, and be quiet, or to shut up.

71. Defendant John Doe 1 targeted Plaintiffs about their voices, alleging to managers that he was bothered by "voice distraction", which appears to arise only from Plaintiffs.

72. John Doe 1 falsely claimed, "that he could hear [Plaintiffs] talking all day", even on days where Plaintiffs were not working in the same area.

73. John Doe 1 does not complain about "voice distraction" when white employees are speaking loudly, even when discussing personal matters, e.g., about marriage proposals, and birthday celebrations of non-black co-workers.

## AUNT JEMIMA

74. During company functions, white staffers have compared black women to "Aunt Jemima" a severely hurtful pejorative, causing severe distress and discomfort in the workplace.

75. Friends of Principals, Elliot and Joseph Franco, have at company functions complained about being unable to "make black jokes anymore", causing distress to black employees and embarrassing them in front of colleagues.

76. On Information and Belief, witnesses to these incidents did not report this conduct, because of fear of retaliation.

77. Defendants have filed formal complaints about a continued pattern of racially motivated disparate treatment and discipline inflicted by Defendant HR and supervisors on Plaintiffs.

78. Plaintiffs have remained under the direct supervision of individuals whose conduct is described herein.

## DEFENDANTS RETALIATE BY ABUSING DISCRETION EMBEDDED IN WRITTEN POLICIES AND PROCEDURES

## COMPLAINT

79. Plaintiffs have expressed to management concern about being asked to take on additional duties beyond stated, contractual roles, and without additional credit, pay, or acknowledgement.

80. Plaintiffs have inconsistent work schedules, and last minute or ad hoc schedule changes while their non-black counterparts do not suffer such indignities.

81. HR directors have used their discretion to discipline Plaintiffs as retaliation for expressing their concerns about disparate treatment.

82. White colleagues complain about being overburdened or working beyond scope without fear of reprimand.

83. Plaintiff Desire was compelled to use her vacation days to seek help in addressing a series of retaliatory actions by Defendants and wholly ineffective enforcement of COVID-19 protocols.

84. Plaintiff Robertson has been subjected to enhanced risk of contracting COVID-19 because of lax protocols, and feared retaliation for reporting these incidents.

85. Plaintiff Robertson was offended by a coworker, and her supervisor demanded that she take a better attitude and start greeting the offensive co-worker. The same supervisor did not require the offending co-worker to feign civility towards Plaintiff Robertson.

86. Plaintiff Robertson was reprimanded for expressing distress at such a command and was subsequently denied a promotion despite a positive work performance review.

**DEFENDANTS FOSTER A CULTURE OF RACIAL PREJUDICE**

87. On Information and Belief, employees of color are de facto segregated; working roles that prevent them from client or front-facing meetings.

88. Supervisors routinely make provocative and prejudicial statements about other employees.

89. In one or instance, supervisory staff asked a Hispanic coworker was asked why she rides

**COMPLAINT**

elevators with some Asian employees.

90. Plaintiffs have been prevented from working at the same time or sitting in the same areas after reporting derogatory comments.

91.  Defendants have targeted Plaintiffs by developing schedules that limit interaction with each other, preventing prospective class of complainants from comparing notes.

## GAG ORDER. ARBITRATION RESPONSE TO #ME-TOO

92. Defendants after revelations arising out of the #me-too era inserted compulsory arbitration clause that operates as a de facto and illegal is a non-disclosure agreement, prohibits employees from publicly speaking out.

93. In or around 2018, Defendants retaliated against individuals who filed such complaints by enacting a companywide de facto gag clause through compulsory Confidential Arbitration Agreements.

94. Defendants' handbook says that an applicant or employee witnesses or otherwise becomes aware of sexual harassment or unlawful discrimination, has an obligation to report the behavior, even if it was not directed at the person reporting behavior.

95. It further provides that supervisors or managers who fail to report sexual harassment will be subject to discipline.

96. Plaintiffs have repeatedly followed the company's handbooks, escalated harassment and discrimination through the company's Internal Processes, by making verbal or written complaints.

97. On Information and Belief, Defendants have not disciplined HR or management who failed to report witnessing unlawful treatment.

98. Plaintiffs were required to sign these agreements as a condition of continuing employment.

99. Plaintiffs took their concerns to the New York Human Rights Division in 2019, but its

## COMPLAINT

counsel refused to take the case, on information and belief, due to the legal complexity of the arbitration agreement, and the risk of concerned about raising such allegations for fear of retribution.

100.   Defendants in 2020 asked Plaintiffs to waive their rights by signing a document stating that they had not complained about discrimination and harassment and had suffered no harassment or retaliation.

101.   Fearing she would suffer adverse consequences from Defendants, Plaintiff Robertson acquiesced to Defendant's demands despite the documents falsity.

102.   Plaintiffs were subsequently targeted for severe criticism, ranging from supervisors claiming that Plaintiff Robertson had "an attitude," or lacked collaborative spirit because she expressed a commonly held concern.

## DEFENDANT FAILED TO COMPLY WITH THE "MINIMUM REQUIREMENTS" TO LIMIT PLAINTIFFS' EXPOSURE TO COVID-19

103.   In 2020, Defendants' asked Plaintiffs to work remotely, but did not reimburse them for use of their own phones, laptops or other expenses.

104.   Plaintiffs were singled out for criticism during virtual meetings for temporarily pausing her video feed, even for valid reasons, including: an inadequate internet connection (which was not subsidized by her employer), privacy concerns, improper comments about her facial expressions or aesthetics and political statements visible in her home environment, and other matters that would be kindle in an already toxic environment.

105.   When staff was asked to return, Plaintiffs were required to come into the office despite lax COVID-19 safety protocols.

106. Employers returning employees to offices must develop a written Safety Plan outlining how its workplace will prevent the spread of COVID-19.

107. No office-based work activities can operate without meeting the following minimum State

## COMPLAINT

standards, as well as applicable federal requirements, including but not limited to such minimum standards of the Americans with Disabilities Act (ADA), Centers for Disease Control and Prevention (CDC), Environmental Protection Agency (EPA).

108.   Plaintiffs were scared to return onsite after learning employees tested positive for COVID- 19 because management failed to take mandated precautions.

109.   Plaintiffs feared catching the virus on one hand, and fear facing retribution for expressing concerns because employer -- the "Responsible Party"--failed to comply with the guidelines:

110.   No Physical Distancing -- Staff routinely exceeded in-person limits and employer did not take sufficient remedial actions, Exhibit A—Images of unventilated, overstuffed rooms.

111.   No Training: – Defendants did not provide staff with training.

112.   Defendants were supposed to institute face covering requirements, post signs throughout the office, consistent with DOH COVID-19 signage.

113.   Defendants should have designated an egress for employees leaving their shifts and a separate ingress for employees starting their shifts) and movements (e.g. employees should remain near their workstations as often as possible).   They did not.

114.   Defendants did not sufficient maintain logs that include the date, time, and scope of cleaning and disinfection.

115.   Defendants, as "Responsible Party" failed to comply with state and federal communication and disclosure guidelines.  On information and belief, Defendants failed to:

i.   "develop a communications plan for employees and visitors, and customers that includes applicable instructions, training, signage, and a consistent means to provide employees with information. "

**COMPLAINT**

ii.     immediately notify the state and local health department about the case if test results are positive for COVID-19.

iii.    Refer to DOH's "Interim Guidance for Public and Private Employees Returning to Work Following COVID-19 Infection or Exposure" regarding protocols and policies for employees seeking to return to work after a suspected or confirmed case of COVID-19 or after the employee had close or proximate contact with a person with COVID-19.

iv.     Designate a central point of contact, which may vary by activity, location, shift or day, responsible for receiving and attesting to having reviewed all employees' questionnaires, with such contact also identified as the party for employees and visitors to inform if they later are experiencing COVID-19-related symptoms, as noted on the questionnaire.

v.      Designate a site safety monitor whose responsibilities include continuous compliance with all aspects of the site safety plan.

vi.     Maintain a log of every person, including employees and visitors, who may have close or proximate contact with other individuals at the worksite or area; excluding deliveries that are performed with appropriate PPE or through contactless means.

116.   Defendant's New York office has had multiple individuals contract COVID-19 in its New York office.

117.    Plaintiffs co-workers have contracted COVID-19.

118.   Defendants failed to report multiple incidents of COVID-19 outbreaks in a reasonable time to staff.

119.   Defendants failed to perform contract tracing.

120.   Plaintiffs were forced to work in windowless rooms, sized approximately 4 by 4 feet,

**COMPLAINT**

with three desks and no effective plexiglass.

121.   These "lightrooms" were and remain unventilated yet three desks.

122.    Plaintiffs worked in these lightrooms routinely during the pandemic, despite CDC

guidelines.

123.   Plaintiffs were in regular direct contact with other employees that were  unmasked.

124.   Plaintiffs made requests to Defendant to end its lax and dangerous practices—in part by

negotiating scheduling preferences — were dismissed by her employer.

125.   Positive COVID-19 cases occurred on Plaintiff Desire's floors, yet she did not hear

about these outbreaks directly, nor was she contacted despite having had possible contact

with individuals who may have been infected or exposed to the infected.

126.   Plaintiff Desire made multiple requests for a change in immediate supervisors.

127.   Plaintiffs Desire's request for changes were driven in-part because, she believed, that

her previous supervisor respected her enough to take her safety concerns seriously.

128.   The current—apparently terminated supervisor—facilitated the lax COVID-19

protocols that caused Ms. Desire so much anxiety.

129.   These facts are among various data points among the multitude of compelling yet

competing reasons for quitting.

130.   Despite the above-noted reports of discriminatory practices, and Plaintiff's repeated

attempts to resolve without resorting to costly litigation, Defendants have continued to

deny, dismiss, or otherwise resist efforts to redress this conduct.

## COUNT 1

## Violation of Equal Pay Act of 1963 (Pub. L. 88-38) (EPA), as amended

131.   No employer … shall discriminate, within any establishment in which such employees

are employed, between employees on the basis of sex by paying wages to employees in

such establishment at a rate less than the rate at which he pays wages to employees of the

## COMPLAINT

opposite sex in such establishment for equal work on jobs the performance of which

requires equal skill, effort, and responsibility, and which are performed under similar

working conditions, except where such payment is made pursuant to (i) a seniority

system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality

of production; or (iv) a differential based on any other factor other than sex.

132.    To bring a claim under the EPA, an employee must show that a female employee and a

male employee are receiving different wages for performing substantially equal work in

the same establishment and under similar working conditions.

133.    Plaintiffs working in similar roles to non-black employees were paid less than to non-

black employees and males performing similar roles, albeit with different titles.

134.    Non-black counterparts received preferential payment and financial awards relative to

Plaintiffs.

135.    As a direct foreseeable and proximate result of defendants discriminatory acts,

Plaintiffs have suffered irreversible losses in earnings, job benefits and employability.


## COUNT 2

## DEFENDANTS VIOLATED THE NEW JERSEY LAW AGAINST DISCRIMINATION (NJLAD), N.J.S.A. 10:5-1 TO -42 BY DISCRIMINATING AGAINST PLAINTIFFS BECAUSE THEY WERE BLACK.


136.    Plaintiffs incorporate by reference each of the above paragraphs as if set forth herein at

length.

137.    New Jersey Law Against Discrimination, N.J.S.A. 10:5-1, et seq., "prohibits

discrimination against a person in the terms, conditions or privileges of employment on

the basis of the person's gender, race, age and handicap and reprisals for complaints of

discrimination and public policy matters..."


## COMPLAINT

138.   Defendants individually, jointly and conspiratorially engaged in acts which were negligent, recklessly intentional and malicious.

139.   Plaintiffs suffered disparate treatment, disparate impact, discriminatory intent, a pattern and practice of discrimination, hostile work environment and evidence of hostility by employers or agents.

140.   Non-black counterparts received preferential treatment relative to Plaintiffs, despite offering up similar grievances.

141.   Defendants' conduct as alleged in this complaint constitutes an unlawful employment practice in violation of the New Jersey Law Against Discrimination, N.J.S.A. 10:5-1, et seq.

142.   At all times, plaintiffs reported to Defendants.

143.   Each of these actions, among others, affected plaintiffs ability to work comfortably.

144.   Defendants caused Plaintiffs discomfort accompanied by anxiety because they were black women.

145.   As a direct foreseeable and proximate result of defendants discriminatory acts, Plaintiffs have suffered irreversible losses in earnings, job benefits and employability.


## COUNT 3

## DEFENDANTS VIOLATED  NJLAD - RETALIATION

146.   Plaintiffs incorporates by reference each of the above paragraphs as if set forth herein at length.

147.   To establish a prima facie case of retaliation under the NJLAD, a plaintiff must show that:

148.   she was engaged in a protected activity known to the Defendant(s); (2) she was subjected to an adverse employment action by the defendant; and (3) there was a causal


## COMPLAINT

link between the two.

149.   Plaintiff bears a "modest" evidentiary burden of showing that retaliation "could be a reason for the employer's action." Zive v. Stanley Roberts, Inc., 182 N.J. 436, 447 (2005).

150.   After the plaintiff establishes a prima facie claim of retaliation, the burden shifts to the defendant to "'articulate a legitimate, non-retaliatory reason for the decision.'" Young v. Hobart W. Grp., 385 N.J. Super. 448, 465 (App. Div. 2005) (quoting Romano, supra, 284 N.J. Super. at 549). Thereafter, the plaintiff must prove that the defendant had a discriminatory motive, and that its proffered reason for the adverse employment action was merely a pretext for unlawful retaliation. Romano, supra, 284 N.J. Super. at 549.

151.   In this case, plaintiffs presented evidence that, beginning they filed complaints with Dreamwear, alleged being subject to unlawful discrimination in the terms or conditions of their employment, which is a protected activity under the NJLAD. N.J.S.A. 10:5-12(a) and (d).

152.   In addition, Plaintiffs established that they were subjected to an adverse employment action when they were subsequently required to sign documents that falsely claimed that they had suffered no harassment in 2020, and were denied promotions, transfers and bonuses earned or which they qualified.

153.   As a direct foreseeable and proximate result of defendants discriminatory acts, Plaintiffs have suffered irreversible losses in earnings, job benefits and employability.

## COUNT 4

## RETALIATION VIA COMPULSORY ARBITRATION

154.   Plaintiffs incorporates by reference each of the above paragraphs as if set forth herein at length.

## COMPLAINT

155.    An agreement to waive statutory remedies must "be clearly and unmistakably

established, and contractual language alleged to constitute a waiver will not be read

expansively." Red

Bank Reg'l Educ. Ass'n, supra, 78 N.J. at 140.

156.    Defendants enacted an unconscionable and inapplicable arbitration agreement to

muzzle Plaintiffs.

157.    Defendants' arbitration agreement further failed to meet the applicable standards to

enforce said agreement.

158.    As a direct foreseeable and proximate result of defendants discriminatory acts,

Plaintiffs have suffered irreversible losses in earnings, job benefits and employability.


**COUNT 5**

**VIOLATION OF CEPA**

159.    Plaintiff's CEPA claim is based on N.J.S.A. 34:19-3a(1), which provides that An

employer shall not take any retaliatory action against an

employee because the employee does any of the following:


a. Discloses, or threatens to disclose to a supervisor or to a
public body an activity, policy or practice of the employer, or
another employer, with whom there is a business relationship,
that the employee reasonably believes:


(1) is in violation of a law, or a rule or regulation promulgated pursuant to law, including any
violation involving deception of, or misrepresentation to, any shareholder, investor, client,
patient, customer, employee, former employee….


**COMPLAINT**

Plaintiff's CEPA claim is also based on N.J.S.A. 34:19-3c(1) and -3c(3), which provides that

an employer shall not take any retaliatory action against an employee because the employee

does any of the following:

. . . .

c. Objects to, or refuses to participate in any activity, policy

or practice which the employee reasonably believes:

(1) is in violation of a law, or a rule or regulation

promulgated pursuant to law . . . ; [or]

. . . .

(3) is incompatible with a clear mandate of public policy

concerning public health, safety or welfare or protection of

the environment.

160.   Here, Plaintiffs have identified policies which affected the public health, safety or

welfare, which the employer has allegedly violated, particularly relating to COVID-19.

161.        Sources of public policy include the United States and New Jersey

Constitutions; federal and state laws and administrative rules, regulations, and decisions;

the common law and specific judicial decisions; and in certain cases, professional codes of

ethics." MacDougall v. Weichert, 144 N.J. 380, 391 (1996);

**COMPLAINT**

## COUNT 6

## HOSTILE WORK ENVIRONMENT

162.   Plaintiff incorporates by reference each of the above paragraphs as if set forth herein at length.

163.   "[O]ne incident of harassing conduct can create a hostile work environment," so long as the incident was "severe or pervasive." The applicable standard is that of a reasonable person in the plaintiff's position.

164.   Here, Plaintiffs outlined a series of covert and severe discriminatory conduct, including references to Aunt Jemima.

165.   As a direct foreseeable and proximate result of defendants discriminatory acts, Plaintiffs have suffered irreversible losses in earnings, job benefits and employability.


## COUNT 7

## Violation of New Jersey Constitution, Article 1, Paragraphs 1, 5, 6 and 18,

166.   Plaintiff incorporates by reference each of the above paragraphs as if set forth herein at length.

167.   Defendants intentionally and recklessly inflicted emotional distress in violation of defendants' New Jersey Constitutional rights.

168.   At all relevant times, Defendant(s) regularly employed five or more persons, bringing the defendant employer within the provisions of the New Jersey Law Against Discrimination, N.J.S.A. 10:5-1, et seq.

169.   Defendants violated plaintiffs' rights under the New Jersey Constitution, Article 1, Paragraphs 1, 5, 6 and 18, which prohibits employers from discriminating against employees on the basis of race, gender, age and freedom of speech and freedom from retaliation for…complaining and grieving of matters against the public policy of this


## COMPLAINT

State.

170. Upon information and belief, defendants possessed such discriminatory' intent in a pattern and practice of discrimination and evidence of hostility by employers or agents.

171. Defendants' treatment of Plaintiffs was pretext for discrimination.

172. Plaintiff's complaints and objections were determining factors in defendant employer's decision to deny each Plaintiff equal terms of employment as Defendants offered non-black employees.

173. Defendants' conduct as alleged in this complaint constitutes an unlawful employment practice in violation of the New Jersey Law Against Discrimination, N.J.S.A. 10:5-1, et seq. And violation of the Public Policy of the New Jersey Constitution, Article 1, Paragraphs 1, 5, 6, 18 and 19.

## COUNT 8

## BREACH OF GOOD FAITH AND FAIR DEALING

174. Plaintiffs incorporate by reference each of the above paragraphs as if set forth herein at length.

175. Defendants' policies for promotion, transfer and equal treatment became policies upon which Plaintiffs relied to their detriment.

176. Defendants' breach of the policies constituted breach of Plaintiffs' implied covenant and of good faith and fair dealing.

177. As a direct, foreseeable and proximate result of defendant's discriminatory acts, plaintiffs have suffered and continues to suffer substantial losses in earnings and job benefits and have suffered and continues to suffer humiliation, embarrassment, mental and emotional distress and discomfort.

178. Defendants committed the acts described in this complaint oppressively, willfully and maliciously, entitling to an award of punitive damages against defendants.

## COMPLAINT

179.   Defendants' actions breached the implied covenant of good faith.

## COUNT 9

## RETALIATION

180.   Plaintiff incorporates by reference each of the above paragraphs as if set forth herein at length.

181.   Upon information and belief, defendants retaliated against Plaintiffs for making complaints of discrimination internally and externally.

182.   Plaintiff filed a report with a state-level Human Rights commission in 2019- 2020, engaged legal counsel to who contacted Defendants to commence an investigation and to preserve all electronic data relevant to a potential suit, and have filed analogous complaints with federal regulatory agencies.

183.   As a result, Defendants have increased the level of hostilities and disparate treatment against Plaintiffs.

184.   Defendants have escalated the harassment, reassignment, denials, and lack of promotion opportunity against Plaintiffs.

185.   Defendants' retaliation violated applicable laws against retaliation.

186.   As a direct, foreseeable and proximate result of acts, plaintiffs have suffered and continues to suffer damages.

## COUNT 10

## DEFAMATION

187.   Plaintiffs incorporates by reference each of the above paragraphs as if set forth herein at length.

188.   Defendants defamed Plaintiff Desire by speaking and publishing false statements about

## COMPLAINT

her conduct after she separated employment.

189.    Defendants committed the acts described in this complaint oppressively, willfully and

maliciously.

190.    As a direct, foreseeable and proximate result of defendant's discriminatory acts,

plaintiffs have suffered and continues to suffer humiliation, embarrassment, mental and

emotional distress and discomfort.


## COUNT 11

### Unlawful Discrimination

### 42 U.S.C. § 1983

191.    Section § 1983 provides that "Every person who, under color of any statute, ordinance,

regulation, custom, or usage, of any State or Territory or the District of Columbia,

subjects, or causes to be subjected, any citizen of the US or other person within the

jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by

the Constitution and laws, shall be liable to the party injured in an action at law, suit in

equity, or other proper proceeding for redress…"

192.    Dreamwear's arbitration clause interferes and/or hinders employees from exercising

their right to sue Dreamwear for claims of unlawful discrimination. As stated in § 1981,

"[a]ll persons within the jurisdiction of the United States shall have the same right in

every State… to sue….".

193.    As a direct, foreseeable and proximate result of defendant's acts, plaintiffs statutory

rights were violated.


## COUNT 12

### 42 U.S.C. § 2000e-2 Unlawful Employment Practices


## COMPLAINT

194.   Plaintiffs incorporates by reference each of the above paragraphs as if set forth herein at length.

195.   It shall be an unlawful employment practice for an employer to "fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."

196.   An unlawful employment practice based on disparate impact is established only if – (i) a complaining party demonstrates that a respondent uses a particular employment practice that causes a disparate impact on the basis of race, color, religion, sex, or national origin and the respondent fails to demonstrate that the challenged practice is job related for the position in question and consistent with business necessity.

197.   As a direct, foreseeable and proximate result of defendants' discriminatory acts, Plaintiffs suffered and continue to suffer substantial losses in earnings, job benefits and has suffered and continue to suffer humiliation, embarrassment, mental and emotional distress and discomfort.

198.   Defendants committed the acts described in this complaint oppressively, willfully and maliciously, entitling Plaintiffs to an award of punitive damages against defendants.


## COUNT 13

### CONDUCT GIVING RISE TO PUNITIVE DAMAGES.

199.   An award of punitive damages is warranted by the nature of wrongful intentional acts of each Defendant and unwillingness to remedy each act.


## COUNT 14

### BREACH OF CONTRACT.

200.   Defendants breached its express and implied obligations to Plaintiffs by enact and


**COMPLAINT**

applying unlawfully discriminatory policies, by failing enforce applicable laws and

regulations, and by failing to enforce COVID-19 protocols.

201.    As a direct foreseeable and proximate result of defendants discriminatory acts,

Plaintiffs have suffered irreversible losses in earnings, job benefits and employability.

202.    Defendants are liable for OUTRAGEOUS CONDUCT by its racist statements, causing

damage and interruption in Plaintiff's ability to continue working, earn an income, and

face their peers.  and contractual opportunities.

**WHEREFORE**, Plaintiffs respectfully request that this Court grant the following relief:

1)   Declare Defendants' conduct complained of herein to be in violation of Plaintiff's civil

Rights.

2)   Damages in an amount greater than $75,000.00;

3)   Compensatory damages, both past and future, including lost wages, benefits and emotional

distress damages in an amount to be determined and proven at trial;

4)   Consequential damages in an amount to be determined and proven at trial.

5)   Emotional distress or "special damages";

6)   Punitive damages;

7)   Reasonable attorneys' fee and all expenses and costs of this action; and

8)   Such other relief and further relief as this Court deems necessary, just and proper.

**COMPLAINT**

## STATEMENT OF DAMAGES RECOVERABLE

Pursuant to L. Civ.R. 201.1(d)(3), the undersigned hereby certifies that the damages recoverable in this action exceed one hundred fifty thousand dollars ($150,000.00), exclusive of interests and costs and punitive damages. Therefore, this action is not eligible for compulsory arbitration.

**WHEREFORE**, Plaintiffs respectfully request that this Court grant the following relief:

1) Declare Defendants' conduct complained of herein to be in violation of Plaintiff's civil rights as secured by 42 U.S.C. 2000d, N.J.S.A 10:5 *et seq.*, and 10:6 *et seq.*;

2) Preliminary and permanent injunction prohibiting the DEFENDANT from operating any of its programs in a racially discriminatory manner and ordering the DEFENDANT to take whatever affirmative action was necessary to remedy the effects of its past discrimination.

3) Damages in an amount greater than $750,000.00;

4) Compensatory damages in an amount to be determined and proven at trial;

5) Consequential damages in an amount to be determined and proven at trial;

6) Emotional distress or "special damages";

7) Punitive damages;

8) Reasonable attorneys' fee and all expenses and costs of this action; and

9) Such other relief and further relief as this Court deems necessary, just and proper.

**COMPLAINT**

By: /s/ Kwame L.A. Dougan

**Scotch & Palm Private Client Law Group, LLC**

Kwame L.A. Dougan, Esq.

Scotch & Palm Private Client Law Group

141 Harris Rd. Princeton NJ 08540

(917)737-9920

kwame.dougan@scotchpalm.com

Attorneys for Plaintiffs

**COMPLAINT**

<u>**Exhibit A - Light Rooms**</u>

<u>**COMPLAINT**</u>

**<u>COMPLAINT</u>**

CERTIFICATE OF SERVICE

KWAME L.A. DOUGAN, of full age, certifies and says:

1.      On October 13, 2021 , I electronically filed the Amended Complaint..

2.      All parties affected by this Notice of Appearance receive electronic service of all filings and therefore all parties will receive a copy of the Amended Complaint.

I certify that the foregoing statements I made are true under penalty of law.

By:  /s/ Kwame L.A. Dougan

Kwame L.A. Dougan, Esq.

Dated:

Respectfully submitted,

Scotch & Palm Private Client Law Group, LLC

By:  /s/ Kwame L.A. Dougan

Kwame L.A. Dougan, Esq.

Scotch & Palm Private Client Law Group

141 Harris Rd. Princeton NJ 08540

(917)737-9920

kwame.dougan@scotchpalm.com

Attorneys for Defendant(s)

**COMPLAINT**